IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Kalika, LLC and | ) | Case No. CA-15-14043-GAO |
| Richard L. Kalika, | ) | |
| | ) | |
| Plaintiffs. | ) | |
| | ) | |
| v. | ) | |
| | ) | U.S. Constitution Article 1 Section 10 |
| Boston & Maine Corporation, | ) | U.S. Constitution 5th Amendment |
| Pan Am Railways, Inc., | ) | U.S. Constitution 14th Amendment |
| Public Service of New Hampshire, | ) | |
| Roger D. Bergeron, | ) | 18 U.S.C. § 241 |
| Robert B. Burns, Esq. | ) | 18 U.S.C. § 1341 |
| R. Matthew Cairns, Esq., | ) | 18 U.S.C. § 1512 |
| Hannah K. Irving | ) | 18 U.S.C. § 1513 |
| Hutton N. Snow, | ) | 18 U.S.C. § 1911 |
| | ) | 18 U.S.C. § 1951 |
| John Does 1-10 | ) | 18 U.S.C. § 1957 |
| Jane Does 1-10 | ) | 18 U.S.C. § 1962(a) |
| Does 1-10, | ) | 18 U.S.C. § 1962(b) |
| | ) | |
| Defendants. | ) | 18 U.S.C. § 1962(c) |
| | ) | 18 U.S.C. § 1962 (d) |
| _____ | ) | 42 U.S.C. § 1983 |

## FIRST AMENDED COMPLAINT

1.      NOW Comes  Kalika LLC by it attorney, Martin H. Karo, Esq. (pending *pro hac* admission ),

and Richard L. Kalika, the sole Owner of Kalika LLC, Pro Se, as Plaintiffs for as Complaint against

Defendants; Boston & Maine Corporation ("B&M"),  Pan Am Railways, Inc. ("PAR"), Public

Service of New Hampshire ("PSNH"), Roger D. Bergeron, Robert B. Burns, Esq., R. Matthew

Cairns, Esq., Hannah K, Irving, , Hutton N. Snow, John Doe(s) 1-10, Jane Doe(s) 1-10, and Doe(s) 1-

10, alleges as follows:

## SUMMARY

2.       Kalika owns crossing rights over the B&M tracks along the Merrimack River in New

Hampshire. These rights are to enable him to use, for any lawful purpose, land he owns on the

otherwise inaccessible side of the tracks.  However, the Defendants have repeatedly and intentionally interfered with those rights, first by refusing to build a crossing altogether; then by building an inadequate one in an unauthorized location; then by literally locking the gates and denying Kalika a key; and finally by purporting to place restrictions on Kalika's use of the crossing and land, restrictions that are not authorized by deed, law or regulation.

### INTRODUCTION

3.      Kalika LLC ("Kalika") has owned the dominant crossing rights to three at-grade railroad crossings since 2003.

4.       The rights to these crossings, and others like them were established in the 1840s when the Concord Railroad Corporation ("CRC") (what is now the B&M) first built the railroad line at issue here.  Laid out to run on the flat land near the Merrimack River, the routing of the new railroad crossed numerous parcels of land, bifurcating them. Recognizing the need to have access to the entire property even after construction of the line, the legislature, in establishing the CRC charter law[1] under which the railroad acquired their parcels of land, also required the railroad to forever provide the landowners along the route safe and convenient access to their land for all legitimate purposes.

5.      In many cases, Kalika's being among them, the railroad and the landowner agreed, in writing (usually via deed), that such crossing(s) were to be at level with their track ("at-grade crossing"). The parties agreed the landowner (again, including Kalika's predecessor), would have a dominant position with regard to the crossing easement, while the Railroad accepted a subservient interest in the crossing, for the sake of obtain their land under the obligations of Law.

6.      These crossing rights, to allow the landowners full use of their (now bifurcated) parcels of land, are property rights protected, inter alia, by Article 1 Section 10 of the U. S. Constitution.  *See*

---

[1] New Hampshire Session Law of 1835 -Chapter 41, "AN Act To Incorporate The Concord RR  Corporation" enacted June 27, 1835. Session Laws of June 1840, Chapter 498, "AN Act Relating To Rail Road And Other Corporations" enacted on June 20, 1840, Session Laws of  November 1840 Chapter 563, Session Laws of  November 1840 Chapter 584

*also White v. Concord Railroad Corp*., 30 N.H. 188, 10 Fost. 188 (1855) (noting history of the Act and requiring compliance with an easement/deed obligations and restrictions regarding a crossing).

7.      These obligations of law under which the easement over what is now Kalika land was conveyed to the railroad by deed(s) in 1841. These obligations remain, and are not changed by the fact that the deeds themselves were not recorded until 33 years later in 1874.

8.      B&M, which acquired the railroad's land assets from the bankruptcy Court in 1983, along with it also acquired the obligations to provide crossing that were tied to the land, both by law and by deed. *See, e.g., Mayor, Etc. of City of New York v. Twenty-Third Street R. Co.,* 113 N.Y. 311 (1889)

9.      Prior to B&M's acquisition of this railroad line in 1983, the railroad would provide crossings as required under their deeded right, or would sometimes extinguish the crossing right by purchasing it from the landowners.  But B&M, after acquiring the railroad assets out of bankruptcy, stopped providing at grade crossing that it was required to provide by contract/deed and law, choosing instead to fight the establishment of such crossings. Indeed, it was B&M's specific policy to fight all at-grade railroad crossings, unless it was economically favorable for them to provide such.

10.     Also pertinent to the instant dispute, in 2006 Article 12-a was added to the New Hampshire State Constitution on December 7, 2006.  It provides:

> "No part of a person's property shall be taken by eminent domain and transferred, directly or indirectly, to another person if the taking is for the purpose of private development or other private use of the property."

11.     This change severely restricted the New Hampshire Department of Transportation ("NHDOT") Commissioner's ability to seize parcels of land or rights appurtenant to land for a privately owned railroad, which B&M is. .

12.     B&M and its co-conspirators have for several years, including each of the last thirteen years, attempted to take, and have effectively taken, Kalika LLC's real property rights, and in doing so have

taken Kalika's rights to the quiet enjoyment of its real property, blocking passage to its land,  locking Kalika from it.

13.      These takings have been accomplished through, *inter alia,* intentional violations of law and contract, mail fraud, fraud, perjury, altering of documents, theft by deception, theft by extortion, theft by unauthorized taking, extortion, providing false affidavits under seal, fraudulent handling of recordable writings, misapplication of property, fraudulent execution of documents, and / or criminal trespass.

14.      Kalika has been harmed by the actions of B&M and its coconspirators.

15.      Richard L. Kalika, acting for Kalika LLC in all actions, has been sued by PSNH and B&M, and has also been harmed by B&M and its coconspirators.

## PARTIES

16.      Plaintiff Kalika, LLC ("Kalika") is a corporation with its principal business in New Hampshire, 1 Hansom Drive, Merrimack, NH, 03054. Kalika owns real estate that abuts B&M land, has rights to B&M's land, and has dominant crossing rights over B&M's land in the vicinity of Star Drive in Merrimack, New Hampshire ("Star Drive").

17.      Plaintiff Richard L. Kalika ("Rick Kalika") is a New Hampshire resident residing at 1 Hansom Drive, Merrimack, NH, 03054, is the sole owner of Kalika and has acted for Kalika LLC in all matters. Rick Kalika was  sued by B&M and PSNH for action he took for Kalika LLC regarding the crossing at Star Drive by B&M and PSNH. Rick Kalika is represented Pro Se.

18.      Defendant Boston & Maine Corporation, ("B&M") is a Delaware Corporation, whose principle business in located in Massachusetts at 1700 Iron Horse Park, North Billerica, MA 01862. B&M owns the track relevant to the crossings at issue in this matter.

19.     Defendant Pan Am Railways, Inc. ("PAR") is a Delaware Corporation, with Headquarters located at 1700 Iron Horse Park, North Billerica, MA 01862. Tel. (978) 663-1131. PAR is the parent of B&M.

20.     Defendant Public Service Corporation of New Hampshire ("PSNH") is a New Hampshire corporation with headquarters at 780 N. Commercial Street, Manchester NH 03101. PSNH is an Electric Company whose principal business is in New Hampshire and which owns property relevant to this matter.

21.     Defendant Roger Bergeron ("Bergeron") is a recently retired Vice President for B&M; his address is currently unknown.

22.     Defendant Robert B. Burns. Esq. ("Burns") has a work address of 1700 Iron Horse Park, North Billerica, MA 01862. Burns is in-house Counsel for B&M.

23.     Defendant R. Matthew Cairns, Esq., ("Cairns") resides at 656 Dolly Road, Contoocook, NH 03229-2517. Cairns is outside counsel for B&M and PSNH.

24.     Hannah K. Irving ("Irving"), Defendant, Work Address:   Gallagher, Callahan & Gatrell, PC, 294 Main Street, Concord, NH 03301, Tel. (603) 228-1181. Real Estate Paralegal

25.     Defendant Hutton D. Snow ("Snow") resides at 33 Riverfront Drive, Unit No.  3, Manchester, New Hampshire 03102.  Defendant, employed as a Project Manager by Northeast Utilities (parent of PSNH), is included in this litigation because he intentionally conspired with B&M to lock Kalika from its property.

26.     Defendant John Does 1-10 are individuals and corporate entities, identities unknown at this time, who conspired with other defendants herein or otherwise acted to deny Kalika Constitutional and property rights as stated herein.

## JURISDICTION AND VENUE

27.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 241, 18

U.S.C. § 1341, 18 U.S.C. § 1512, 18 U.S.C. § 1513, 18 U.S.C. § 1911, 18 U.S.C. § 1951, 18 U.S.C. §

1957, 18 U.S.C. § 1964, 42 U.S.C. § 1981, 18 U.S.C. § 1965, 18 U.S.C. § 3231,  28 U.S.C. § 1331,

28 U.S.C. § 1343 and 28 U.S.C. § 1391

28.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1331 because the primary

corporate (railroad) Defendants are headquartered in this district and several individual defendants

reside in this district.

## RELIEF SOUGHT

29.      The issuance of an injunction or other order enforcing Kalika's real property rights and rights

of due process as guaranteed by the U.S. Constitution's 5th and 14th Amendments, and by the

Constitution of the State of New Hampshire Part 1 Articles 2, 12 & 12a.

30.      The issuance of an injunction or other order protecting Kalika against violations by the State

Defendants of Article 1 Section 10 of the U.S. Constitution, as set forth below.

31.      The issuance of an injunction or other declaratory order enforcing the Charter obligations of

the B&M Railroad, and its predecessors in title.

32.      Damages in excess of $75,000.00 for breach of contract.

33.      Compensation of Kalika for damages for past, present and future impairment of its property

rights.

34.      Treble damages for fraud as detailed below.

35.      Treble damages for violations of the Racketeering and Corrupt Organizations Act.

36.      Damages for intentional infliction of emotional distress.

37.      Damages and attorney fees from B&M, as are provided under the provisions of the New

Hampshire Session Laws of November 1840 Chapter 563 – "An act in addition to and explanatory of

an act relating to rail road and other corporations, passed June 20, 1840" enacted on December 23,

1840, including but not limited to damages to Kalika and Rick Kalika due to deprivation of profits from a sport complex it planned on building on its property and/or the sale of the real property for its best value.

38.     An injunction or other declaratory order requiring the relevant defendants immediately build safe and convenient crossing(s) for Kalika to allow all legitimate uses of its land.

39.     Plaintiffs Kalika and Richard Kalika also request such other damages/relief that the Court deem just.

## FACTUAL ALLEGATION COMMON TO ALL COUNTS

40.     In 1835, the Concord Railroad Corporation ("CRC") was established in New Hampshire[2]. The New Hampshire legislature, in the CRC charter, provided for the Railroad to acquire strips of land no more than 99' in width from landowners whose land lay adjacent to the Merrimack River, along the River for their Railroad.

41.     Realizing the burden such strip of land would have upon the landowners, as their land would be bisected (the eastern part of their land open only to the Merrimack River, and the west part of their land open only to The Great Road, now known as Daniel Webster Highway) and thus rendered partially and seasonally inaccessible,[3] the Legislature in the charter placed the off-setting burden upon the railroad to ensure that landowners had road, private ways, etc. connecting what was now to be their two parcels of land (one on each side of the land conveyed to the railroad). The railroad was granted the power to raise or lower a road, private way, etc. if necessary that it may conveniently pass under or over the road, as long as such was satisfactory to the landowner, the law provided that the landowner may require in writing from the railroad such alteration or amendment as they may think necessary. If the railroad did not reasonable construct such alterations and amendments that the

---

[2] The Concord Railroad Corporation through merger became part of what is now called Boston & Maine Corporation
[3] During the winter when ice was on the river it was not navigable and in the spring and fall mud season left the Great Road not navigable.

landowner the landowner may do so and seek the recover reasonable damages for all charges in making such alterations and amendment and the cost of suit. See New Hampshire Session Laws of 1835 – Chapter 41 Section 11 (**Exhibit #1**, pgs. 7-8)

42.  In 1840, the legislature in their June Session changed the Charter to ensure that the landowner's property right would be more protected, and that they and the livestock would be protected from the Railroad. The law made it unlawful for the railroad to take use or occupy any of the landowners' property without the landowner's consent, and it required the railroad to erect and keep in good and sufficient repair, a proper and sufficient fence on each side of its track through its entire route. See New Hampshire Session Laws of 1840 (June) - Chapter 498 – Sections 3 & 4. (Ex**hibit #1**, pgs. 18-19).

43.  In the November Session of 1840 the Legislature, suspecting sharp practice by the CRC, passed an additional law, specific to the CRC, providing that if the Railroad and the landowner were unable to agree as to a crossing or the purchase of the affected land, the railroad was required to apply to the Court for the Court to determine possible damages and value of the land, and additionally to place double that amount as security with the Court. In the absence of such application and/or deposit, the Court would issue an injunction against the any further proceeding of the railroad and the railroad would be liable for treble damages to the landowner.   See New Hampshire Session Laws of 1840 (November Session) - Chapter 563. (**Exhibit #1,** pgs 20-21).

44.  Demonstrating the seriousness of the crossing issue, during the same November Session of 1840 the Legislature also passed a law that provided a drastic self-help remedy: when the landowner was not fully compensated for its land taken by the Railroad, the landowner could remove the rails from said railroad, fence up the land, and take and retain possession of the and the same until entire satisfaction was made to the landowner.   See New Hampshire Session Laws of 1840 (November Session) - Chapter 584 (**Exhibit #1**, pg. 23).

45.     Clearly the Legislature in Chartering the CRC and passing the above-noted additional laws had clearly determined that the landowner real property rights would be protected and preserved, and the landowner would be able to use each of its bisected parcels of property for any purpose it wished. This right was unrestricted, as there were no Zoning regulations at that time nor any land use restrictions in common practice (and probably not even contemplated at the time). *See, e.g.,* White v. The Concord Railroad, 10 FOST. 188, 30  N.H. 188 (1855):

> Under this Act, wherever it should become necessary to have a crossing, and one should be made, the land-owners would have the right *to use it in all proper and reasonable ways*, with their teams, horses, cattle, sheep, & etc. [the known modes of land transportation at that time teams being used in commercial and industrial modes of commerce at that time.] The Act requires the crossing to be made for the convenience and safety of the land-owners, and they would consequently have the right to cross the road at all reasonable times, and of necessity the right to be upon the road while crossing.
>
> By the provisions of law, then, the plaintiff had the right to require of the defendants that  the passway should be such as would insure safety in crossing the railroad in all legitimate  ways and at all seasonable times[.]
>
> The plaintiff chose not to leave the matter with the corporation to say what the position of  the crossing should be; and he chose further, to make it a part of the condition of the conveyance, that the crossing should be on a level with the track. And the defendants took the land with this condition attached. They agreed that the crossing should be made on the level, instead of over or under the road, or in such way as they might choose to make it; and in thus agreeing, no legal liabilities as to the use of the pass-way or the safety of the cattle in crossing, were changed; but the defendants took upon themselves the additional risk of a crossing on the level with the track, for the sake of obtaining the deed. **10 FOST. 188, 30 N.H. 188 (N.H.), 1855 WL 2599 (N.H.) (WHITE v. THE CONCORD RAILROAD)**

> *Id*. (emphasis added).

46.     Unless specifically agreed to the contrary between the Railroad and the landowner, the railroad would have the continuing and continuous obligation to provide the landowners access to its property for all the property's legitimate uses.

47.     A Map has been included to help the Court understand the land discusses in relation to  to context of this petition. (**Exhibit #2)**

48.     William Lund ("Lund"), Kalika's predecessor in title of one of the three at grade crossings for which Kalika owns dominate crossing rights conveyed a strip of his land to the railroad under these Special Charter Laws in a Deed dated June 3, 1841. The conveyance was recorded in the Hillsborough County New Hampshire Registry Deeds ("Registry of Deeds") on December 29, 1874 at Book 422 Page 7.  In relevant part the Deed states:

> The Concord Railroad Corporation and its assigns [] are forever to fence both sides of said parcel and to prepare a good and suitable crossing on a level with track and e[r]ect suitable bars or gates at said crossing which is to be where said Lund may choose.

See **Exhibit #3.**

49.     In other words, with regard to the Lund conveyance, the CRC's statutory obligations to forever provide a crossing and fencing were repeated in the Deed, with the additional agreed specifications that the crossing was to be at level with the railroad track and that Lund would have the right to choose the location of the crossing.

50.     Adjacent to the north of the Lund property lay the property of the Crooker Family (John E. Crooker, Sarah Crooker, Sarah Anne Crooker, Benjamin J. Crooker Martin M. Crooker, Mary R. Crooker, William Crooker, Henry  Augustus Crooker and Abel Crooker). The Crooker Family conveyed their land via two separate transactions to the CRC.  The Crooker conveyances differed in location from each other, as to be expected given they dealt with separate parcels (one crossing was to be "at the present narrowtrith," the other "at the present farm path").  But in substance both were essentially the same as the Lund conveyance, with the additional specification that the railroad provide three-rail fencing (probably the best in common use at the time) to protect the remaining bifurcated parcels.  See Deeds executed August 10, 1841 and recorded on December 29, 1874 in Registry of Deeds on  December 29, 1874 at Book 418 page 487 (**Exhibit #4**) and Book 423 Page 243 & 244 (**Exhibit #5**).

51.     It is important to note that Oliver Spaulding Jr. signed both Crooker Deeds, one as a guardian and the other as a witness.  Peter Clark, the agent of the railroad, signed both deeds as a witness.  This difference, combined with the difference in the description of the location of the crossings in each deed, makes it clear each deed obligated the Railroad to provide a separate and distinct crossing.

52.     These obligations on the railroad to provide crossings, recorded within the deeds of conveyance themselves, impose a continuing and continuous obligation.  *See, e.g.,* MORROW ET AL V. CINCINNATI, NEW ORLEANS AND TEXAS PACIFIC RAILWAY COMPANY ET AL, 29 F.Supp.2d 443, 447 (E.D.Tenn. 1997) (neither statute of limitations nor laches bar enforcement of deed covenant requiring railroad crossing).

53.     Kalika acquired its rights to the crossing in the Lund and Crooker Family Deeds from the S. Robert Winer Revocable Trust via a deed dated June 12, 2003 and recorded June 13, 2003 at the Registry of Deeds on Book 6957  Pages 2815-2823 (**Exhibit #6**) . This included a Parcel shown on the Town of Merrimack Tax Map as 3D-1:Lot 5 ("Lot 5") (the bisected eastern portion of the Lund property (river side and thus locked by the Railroad), all rights established by law and Lund Deed to cross the Railroad land, dominant easement rights over a portion of the western portion of the Lund property (road side), all the rights Lund retained in the property sold to the Railroad); additionally it also included a Parcel shown on the Town of Merrimack Tax Map as 3D-1:Lot 7 ("Lot 7") (portion of the bisected western Crooker Family property abutting the railroad property that which was the western portion of the Lund property and what is currently known as Star Drive), and the rights which run with the land to the two Crooker Family at grade crossings.

54.     Kalika on December 13, 2010 acquired from CMI Leasing Corp. an access and utility easement of CMI leasing Corp.'s Lot 4, the bisected eastern portion of the Crooker Family property (river side and locked from the road by the railroad), which is recorded at the Registry of Deeds as Book 8274 Page 0930 Pgs. 1-3 (**Exhibit #78**), Kalika is under contract to acquire all or part of Lot 4.

55.     Kalika on October 21, 2011 acquires Lot 4-1 (a portion of the eastern portion of the Crooker Family property (river side and locked from the road by the railroad) as recorded at the Registry of Deeds on October 24, 2011 in Book 8361 Page 0983 pgs. 1-2, (**Exhibit #8**)  along with rights to both Crooker Family Crossings which run with the land.

56.     In sum, via several purchases, Kalika acquired the rights to all three crossings – the Lund crossing and both of the Crooker crossings.

57.     In 1970 B&M entered bankruptcy. Guilford Transportation Industries ("Guilford"), Inc. purchased it in 1983.  In 2006 Guilford changed its name to Pan Am Railways ("PAR"). B&M remains a subsidiary of PAR today.

58.     Centuries-old property rights notwithstanding, P&R took a dim view of crossings. The ostensible reason was safety. In April of 2005 David Armstrong Fink, then Executive Vice President of Guilford Rail System, stated "We're always opposed to crossings because they add to the danger of the Railroad, There is no such thing as a safe crossing".  (**Exhibit #9**)  At a July 27, 2015 hearing at NHDOT hearing B&M employee, Edwin Krug, Chief Engineer of Design and Construction under oath confirmed that it is an unwritten policy of B&M for the Railroad to oppose all at-grade rail crossings.

59.     In 1971 B&M and Anheuser–Busch installed a crossing and a siding on their property; the siding was located at the point of land where B&M land acquired from Lund intersects it.  The Anheuser – Busch Agreement make provisions within their contract to make accommodations for any changes in B&M track that they may make (such would include providing a crossing as obligated under the Lund Deed).  (**Exhibit #10**) B&M never notified the then-owner of the Lund land, S. Robert Winer "Winer"   of such.  Even though Winer had the year before reminded the Railroad of their obligation under the Lund Deed see ¶61 below and (**Exhibit #11**)

60.     One of Kalika's processors in title of the Crooker Family Land, Brox Paving Materials, Inc. ("Brox"), in 1989 attempted to have the railroad install an at grade crossing at Star Drive, which

B&M rejected, ostensibly for safety reasons.  Yet when Brox was willing to do business with B&M, including adding a siding to accommodate that the business with the Railroad, B&M suddenly decided a Brox crossing would be just fine; this, even though adding a siding adds to safety complications with a crossing. (See **Exhibit #17**). In the end, Brox decided not to pursue his business venture there, and neither the siding nor a crossing were installed.

61.     One of Kalika's processors in title of the Lund property, Winer, several times notified B&M of their obligation to provide him a crossing under the Lund Deed. The B&M initially acknowledged the obligation (indeed, as far back as 1970), but ultimately refused to provide one, and Winer was not able to force them to through the administrative process. (See **Exhibit #11**).

62.     It is important to reiterate that under New Hampshire RSA 373:1 et al, it is the duty of every railroad to provide safe and convenient crossings for the accommodations of those whose land is divided or separated from the highway (locked land), and that under NH RSA 374:4 the NHDOT Commissioner has the duty to know the provisions of the Railroad charters and inforce compliance with all provision of law, orders of the Commissioner and Charter requirements.  (**Exhibit #13**)

63.     Kalika purchased the Lund parcel from Winer (See ¶¶53 above), with the intention of building a sports complex (baseball/football fields etc.) on the property, and sued B&M in New Hampshire's Hillsborough County Superior Court to obtain a crossing for its sports complex. The Court ordered that a crossing be provided but for not a sport complex. Such a complex was an allowed use under the Town of Merrimack Zoning Regulations, but the Court ruled that use of the crossing created by the deed was restricted to what would have been a typical use of the property back in 1841 – farming and residential access -- which did not include sports complexes.

64.     The case was appealed by Kalika for use limitations, and cross appealed by B&M for not allowing its witnesses to heard (the Court had dismissed B&M's first witness, Roger Bergeron, when it was found he gave false testimony in an attempt to validate a doctored document, and B&M's second witness was not allowed to testify after the Court rejected B&M's offer of proof as to his

testimony. At the trial the attorneys for B&M – Cairns and Katherine E. Potter, Esq. -- attempted to enter into evidence a document that had been altered from the one B&M had provided Kalika in discovery and to Rick Kalika at his deposition; additionally they attempted to enter into evidence a document that had been doctored in an attempt to date and label it, which the Court did not allow. The matter was remanded back to the trial Court by the State Supreme Court.

65.     While the Lund crossing matter was awaiting re-trial, Kalika tried to get a crossing for his land and the land of CMI Leasing Corp, ("CMI") which Kalika had under agreement since 2004 for all legitimate uses of his land and the CMI he had under agreement for sports complex, and/or for use of to sell the land user of its property, using one of the Crooker crossing rights. NHDOT stalled, claiming (through its hearing officer, Kathleen Mulcahey-Hampson) that NH RSA 374:4 notwithstanding, NHDOT had no authority to enforce the Railroad Charter and the matter was not proven ripe for a hearing anyway.

66.     Upon retrial, the Hillsborough County Superior Court ordered again that B&M was to provide Kalika a crossing, but that Kalika's proposed use was an unsanctioned enlargement of the deed (**Exhibit #14**).   The matter was appealed again by Kalika based on its limiting the crossing from a legitimate use of its land, and the B&M cross-appealed claiming adverse possession, laches, and estoppel.

67.     While the appeal was pending, Kalika filed a new petition with NHDOT to at least enforce the Court's order and provide Kalika a crossing south of Star drive at Winer's designated location. NHDOT stalled, and Kalika obtained a mandamus order requiring NHDOT to act within the 120 day period as required by NH RSA 541-A:29.   And here the petitions that Kalika had filed both for the crossing at Star Drive and the crossing south of Star Drive. Kalika's position was supported by

PSNH.[4]   On August 4, 2010 NHDOT Hearings Officer Kathleen Mulcahey-Hampson, Esq. mad a

ruling ruled on Kalika's Petition, (**Exhibit #15**)

68.     In a Conditional Settlement Agreement dated September 1, 2010 and signed September 9,

2010, between B&M and Kalika (the "Conditional Agreement") (**Exhibit #16**), the parties agreed that

a Crooker Family crossing (at Star Drive, in Merrimack, NH), which B&M was obligated to provide

under a Crooker Family Deed, would also be considered the crossing the Railroad was obligated to

provide under the terms and the Lund Deed. Under the Conditional Agreement, Kalika would provide

a Notice of Choice of Crossing Location and Crossing Right under the terms of the Lund Deed. The

Conditional Agreement further provided the following important restriction: the litigation releases

between B&M and Kalika, well as Docket Markings for those matters under litigation, *were to be*

*held and not released* until such time as B&M <u>meet all</u> their obligations to provide the crossing

required under the agreement, and that they were to be destroyed if the crossing was ordered to be

constructed outside the terms of the this agreement.  The crossing was to be constructed to have two

10' travel lanes and two 2' shoulders, for a total travel width of 24'. The Crossing was to meet or

exceed American Railway Engineering and Maintenance-of-Way Association ("AREMA") Track and

Roadway Geometry Standards and Federal Highway (FHW A) and Federal Railroad Administration

("FRA") guidelines for a private crossing (which the Railroad stated to the best of it knowledge and

belief were the applicable maximum standards for typical private crossings within New Hampshire).

In addition, the Crossing was to be construed consistent with AREMA, FHWA and FRA to meet the

minimum standards necessary for PSNH's use in accessing Lot 5, a significant issue since PSNH

---

[4] Kalika on December 15, 2010 sold Lot #5 to PSNH, retaining the Lund crossing rights but providing PSNH non-exclusive right to use that crossing. As recorded on December 16, 2010 in the Registry of Deed at Book 6274 Page 0933 pgs. 1-5. (**Exhibit #22**). Kalika also agreed to provide PSNH nonexclusive use of its Lund Crossing, which had been conditionally agreed to be located at Star Drive[4] and non-exclusive use to the access and utility easement over Lot #4.  (Kalika retaining the rights to use and pave the easement area).

wished to use Lot 5 as an electrical sub-station and attendant facilities.[5]   B&M and PSNH were to work in good faith to design and construct such a crossing; but in no event were Kalika or PSNH to be required to bear any of the costs of construction of the 24' wide crossing. After installation the Crossing provided by the Railroad would be considered the "Kalika Private Crossing," and would be recorded simultaneously with Kalika's recording of its location choice.  If the Conditional Agreement became void for any reason prior to construction of the Star Drive Crossing, within the Agreement Kalika retained the right to install a crossing at the location of the 100' wide easement across the property of GT Equipment Technology, Inc.

69.     The Conditional Agreement had a second critical condition: the Releases and Docket Markings were to be held pending Kalika's appeal of the order granting the Lund crossing but restricting it; if the Supreme Court ruled in Kalika's favor in the matter on appeal, the Releases and Docket Marking would be destroyed and the railroad would have to build a larger crossing.  Despite this condition, which clearly contemplated continuing the appeal, B&M attorney Cairns filed with the Supreme Court on September 8, 2010 (after negotiating but prior to his signing the Conditional Settlement Agreement) asking the Court to postpone a hearing on the matter scheduled for September 23, 2010.  The matter was postponed, but rescheduled to October 28, 2010 after Kalika alerted the Court it should not to stop the hearing and why. At the hearing Cairns nevertheless pled to the Court that there was a Conditional Settlement Agreement  in place and that B&M was in the process of constructing the crossing, representing it would be completed by the next week, November 5, 2010. Cairns followed up to the Court, on November 5, 2010, with a letter stating that construction had begun on the crossing.[6]

---

[5] This would apparently require a variance, as such was not then thought to be an allowed use of the property per Town of Merrimack Zoning Regulations.

[6] This appears to have been inaccurate.  The included pictures in the exhibits attached to the letter showed no construction had started on a crossing (**Exhibit #17**), and pictures from Google Earth from June 2010 show that the claimed brush cutting the Railroad did had been done  already (**Exhibit #18**).

70.     As the Conditional Settlement Agreement provided that PSNH and B&M shall work in good faith to design and construct the crossing, a meeting was held to determine the safety parameters.  The meeting included B&M, CMI, Kalika, NHDOT Rail and Transit Department, PSNH and the Town of Merrimack, as they were all involved with the crossing.  At that meeting those specifications were discussed and on September 28, 2010 a Letter of Concurrence was issued by the Commissioner, and such was attached and incorporated into his October 7, 2010 crossing order.

71.     The NHDOT Commissioner in his recorded order provided a minimum 24' wide travel lane, and it incorporated both the Conditional Settlement Agreement and Letter of Concurrence which outlined specifics of the crossing. The ruling was nevertheless confusing in that while it purported to incorporate the Conditional Settlement Agreement and combine it with the PSNH requirement for a crossing reaching its parcel, the Order on its face stated the crossing was for the sole use of PSNH.[7] The Commissioner's ruling was in Kalika's petition (NHDOT 2009-04) which was for a crossing at Star Drive (Crooker crossing) which NHDOT had already ruled that Kalika had no standing but was allowed to continue based on CMI's standing, which had allowed Kalika to petition for CMI; the order also combined Kalika's petition (NHDOT 2010-07) for a crossing south of Star Drive (which was on appeal but not stayed), one must assume that Commissioner, assuming that B&M would build the crossing per the Conditional Settlement Agreement, was looking to have one crossing serving two crossing obligations of the railroad. (But B&M did not build the crossing that the NHDOT Commissioner had ordered it to nor that the Conditional Settlement Agreement required it to do. More confounding is why the Commissioner would order a crossing at Star Drive which had already been ruled is for the CMI to reach its locked Lot 4, which is entered unto by the crossing, but yet did not provide CMI use of the crossing.

---

[7] The intent of the Commissioner remains unclear; for example, the order required Kalika to clear snow at the crossing, even though it specified the crossing was for the exclusive use of PSNH.

72.     The Commissioner's duties do not allow for him to provide him to limit the use of the crossing and thus the landowner's land; the statute (NH RSA 374 requires him to enforce the obligations of the railroad (the servient easement holder) to provide the landowner (the dominant easement holder) a safe and convenient crossing for all the legitimate uses of the landowner's property. Neither the Commissioner nor NHDOT have any right to take any of Kalika's property rights, as limiting the use of the crossing would do.

73.     Contrary to Cairns' representations at the Supreme Court hearing, the Lund crossing <u>did not</u> get built in the time frame required by the Conditional Settlement Agreement[8]. Kalika on November 18, 2010 filed a motion in the Hillsborough Superior Court against the NHDOT Commissioner for him to compel B&M to construct the crossing as NHDOT had ordered B&M to construct. B&M responded in Court that it had run into delays from union problems and Dig-Safe. Cairns also had claimed that Kalika had yet to sign the releases and Docket Markings as the Conditional Settlement Agreement had required it to do.  This was untrue; Kalika had signed the original releases (see **Exhibit #19**) but B&M sought to alter the verbiage of the documents and wanted new documents signed, which Kalika was unwilling to do.

74.     Cairns send two documents to Kalika via U.S. Mail, in an attempt to induce Kalika to sign the releases Docket Markings. Cairns on November 30, 2010, sent a letter by U.S. Mail to Kalika in which he stated that the B&M had completed the Kalika crossing in accordance with the requirements outlined in the Conditional Settlement Agreement, the DOT order and the Letter of Consent and the Plan; but the B&M had locked the crossing and would only turn over the keys to the crossing once Kalika signed a revised release, plus the Docket Markings required by the Conditional Settlement Agreement (**Exhibit #20**). Kalika refused to do so. Cairns again on December 7, 2010, again attempts to extract from Kalika signed revised releases, threatening that if Kalika does not sign the documents, the Railroad will file motions to vacate NHDOT October 7, 2010 crossing order. (**Exhibit 21**).

[8] The crossing has never been built to the condition required in the Conditional Settlement Agreement.

Kalika, taking Cairns at his word that the B&M had carried out all its obligations to construct the crossing pursuant to the Conditional Settlement Agreement and the Commissioner's Order, signed the revised releases and Docket Markings on December 15, 2010.

75.     As it turned out, the crossing deviated significantly from the Conditional Settlement Agreement and Commissioner's Order terms.  The crossing was constructed narrow than the minimum travel width specification required of the crossing by approximately four (4) feet; as such, the construction also did not meet the guidelines of the Federal Railroad Administration or the Town of Merrimack. Additionally, the crossing was of one gravel surface, had no separate lanes or shoulder, and the crossing gates and fencing were not located on B&M's property, but had been improperly placed on Kalika's.  The "Supra" key box required by the Town of Merrimack required was not installed, and finally it was not suitable for all approved uses of the crossing at that time.   The Cairns/B&M letters were purposeful misrepresentations made to extract signatures on documents that Kalika had been unwilling to sign.

76.     Kalika on December 15, 2010 sold Lot #5 to PSNH, retaining the Lund crossing rights but providing PSNH non-exclusive right to use that crossing. As recorded on December 16, 2010 in the Registry of Deed at Book 6274 Page 0933 pgs. 1-5. (**Exhibit #22**). Kalika also agreed to provide PSNH nonexclusive use of its Lund Crossing at Star Drive[1] and non-exclusive use to the access and utility easement over Lot #4.  (Kalika retaining the rights to use and pave the easement area).

77.     Unbeknownst to Kalika and without his knowledge or approval, Cairns released the Docket Markings to the Court, and B&M attorney Robert Burns, Esq. ("Burns") released the Docket Marking to the NHDOT.[9] (**Exhibit #23**)

---

[9] Both Cairn and Burns the signatories for B&M on the Conditional Settlement Agreement.

78.     Also unbeknownst to Kalika, after its closing with PSNH on December 15, 2010, PSNH and B&M literally met at the crossing and each locked the crossing gates with their own locks, so that Kalika could not access the crossing.[10]

79.     Kalika became aware of B&M's Court filing in late January/early February 2011. Kalika's Attorney, Gregory E. Michael, Esq. ("Michael") promptly notified Cairns that Kalika had yet to receive keys to the crossing, and subsequently of the discovery that the crossing was too narrow and none of the fencing and gates B&M had installed on both sides of the crossing was on B&M property. (**Exhibit #24**)

80.     In furtherance of permitting the use of Lot 5 for a non-approved use as an electrical Sub-Station, PSNH, Kalika and CMI jointly petitioned the Town of Merrimack for the approval of the electrical Sub-Station on Lot 5. Kalika was involved as a petitioner because at the time of the petition Kalika owned Lot 5 and the railroad crossing at the end of Star Drive.  CMI was involved in the petition because the proposed access road from the crossing to Lot 5 would be over their property, Lot 4. The Town was aware of the NHDOT Crossing order (**Exhibit #16**), and in addition the Town Fire Department Captain testified the Crossing required a 24' road width, and that a Supra Key box was required on the gate so that they are available for fire department emergency use. (**Exhibit #25**) Kalika and CMI noted that both for purposes of the Conditional Settlement Agreement and operational necessities, the B&M crossing, as constructed (20'), was too narrow. (**Exhibit #26**) PSNH, however, notified the Township it was willing to accept a 20' crossing width. (**Exhibit # #27**) Despite having first-hand knowledge that only NHDOT could approve the specification of an at grade railroad crossing, the Town of Merrimack Planning Board (summarily and arbitrarily and capriciously

---

[10]  It should be noted that neither could CMI.

removed Kalika and CMI from their joint petition with PSNH,[11] then approved the (now only) PSNH

petition allowing the crossing at twenty feet.

81.     Further illustrating the illegality (or at least arbitrary and capricious irregularity) of the

Board's action, Kalika was specifically informed by the Town of Merrimack Chief Engineer (Kyle

Fox, P.E. who had attended the meeting in September 2010 with regard to NHDOT Commissioners

requests for the crossing, see ¶69 above) that Kalika needed to ensure that the Kalika crossing gates

and fencing were not located in the Town's right of way -- which they currently were, as B&M had

built them there -- and that Town of Merrimack Fire Department required that the crossing be 24' in

width. Also, there was still the requirement that an Approved Supra Key Box be attached to the gate

to allow the Fire Dept. access as it was the only access road to the property on the river side of the

crossing. (**Exhibit #28**)

82.      To try to protect himself despite the Board and B&M's actions, Kalika ordered the required

key box and engaged an engineer Steven B. Keach, PE ("Keach") to determine the crossings location

and width. Keach determined that the crossing gates and fencing were located on the town's right-of-

way and CMI's and Kalika's property, and that the crossing was 20' wide between the gates. (**Exhibit

#34; Exhibit #39**)

83.     B&M had in fact constructed the crossing at the direction of Pan Am Railways to the

specification of a 20' wide "farm" crossing with four wooden gate posts connecting 10' gates, wire

mesh fencing, attached to the gate posts and with a gravel surface (**Exhibit #30**).

84.     Kalika notified B&M and NHDOT that it would take such action (**Exhibit 31**) as the law

requires (see ¶44 above) to provide itself a proper crossing consistent with the law and NDHOT's

order. On May 3 - 5 Kalika widened the gravel surface to 24' width, cut the existing lock (to which it

had still not been given a key), moved the gates and gate posts to the proper width to provide for a

---

[11] Dropping Kalika and CMI from the petition was indeed arbitrary and capricious. PSNH had acquired lot 5 and non-
exclusive rights of access over Lot 4 and Kalika's Crossing, but CMI still owned Lot 4 and Kalika still owned Kalika's
crossing, all of which were integral parts of what was now (due to the Board's action) the PSNH-only petition.

travel width of 24'located on B&M property[12], and supplied a new lock and the Supra Key Box attached to the front post where the town Fire Department Captain had instructed Kalika to place it. Kalika provided CMI and PSNH keys to the new lock on the crossing. (This was the first time Kalika and CMI had access over the crossing that NHDOT had access.  It is further noted that *B&M* does not have access rights at this location). The parcels of land east of the crossing (Lot 4 and Lot 5) were now safe from fire damage, and the Kalika alteration fell within the specifications of NHDOT's crossing order.

85.     B&M on or about May 9, 2011 discovered that the crossing was altered. B&M's V.P. Roger Bergeron had written Kalika on May 12, 2011 about the crossing alteration, Kalika informed Bergeron that he had made them to ensure the safety of the properties east of the crossing, and that their Conditional Settlement Agreement was thus void (since B&M had not met the terms regarding the crossing construction). (see  Affidavit by Roger Bergeron in which they are contained (**Exhibit #32**)

86.     On May 9, 2011 B&M had their own Railroad Police investigate, who, accompanied by a Town of Merrimack Police Officer, went to Kalika's home on May 16, 2010 and Mirandized Rick Kalika in front of his children. After Kalika had told the police the history of the crossing and his side of the story, his crossing rights and provided the B&M Police Officer several documents validating what he had told them the police officers left (**Exhibit #30**).

87.     B&M and PSNH initiated suit against Kalika, claiming damages to the crossing. (PSNH removing itself for the suit as part of meditated settlement agreement with Kalika).  The gravamen of their action was their claim that the crossing was properly constructed according to the Conditional Settlement Agreement and the applicable orders and law.  Had they admitted the crossing was inadequate and on Kalika's property instead of B&M's, they could not have pursued the action.

---

[12] Kalika did not move the fencing.

88.     Despite suing Kalika for moving the gates and gate posts, subsequent actions by B&M and PSNH indicated they knew all along Kalika was right on the facts and within his rights on the law. Notably, on February 16, 2012, having been informed that B&M had moved the gates and fencing onto B&M property, Kalika went to the crossing with the Town of Merrimack Police and verified with Hutter Construction employee, Doug Sanborn, that at approximately the end of January 2012 B&M had quietly moved the fencing, gates and gate posts back 3' on both sides of the crossing, relocating them onto B&M property. (See Town of Merrimack Police Report of February 18, 2012 – **Exhibit 33**). (See pictures of the Crossing after B&M moved the crossing taken April 10, 2012 note square gate posts – **Exhibit #34**).

89.     In the Plaintiff's Memorandum in Support of Summary Judgment the affidavits of Bergeron Hutton N. Snow ("Snow)", Hannah K. Irving ("Irving") and Cairns were all attached and falsely stated Material facts. (**Exhibit #35).** Bergeron stating the PSNH worked with PSNH on the construction of the crossing, which was untrue (See Snow Deposition **Exhibit #36 -** pgs. 80-81); and for safety reasons, That he directly involved in the crossing construction and design, yet knowing B&M owned a 66' wide strip of land they built the crossing gates and fencing at a width of 68' (see Affidavit of Steven B. Keach, PE **Exhibit #29**);   That because of Kalika's alteration's B&M was forced for safety sakes to close the crossing, yet PSNH's Snow stated that the closing occurred after a discussion with him in which they agreed to close the crossing because it would not delay their project (Snow Deposition **Exhibit #36**– pgs. 64-65). Snow's affidavit falsely stated:  PSNH inspected the crossing and deemed it adequate and sufficient for its use, (neglecting to tell state that PSNH knew it did not meet the minimum specifications that NHDOT had ordered the crossing be built to nor did in meet the Town of Merrimack Fire Regulations, making the crossing unlawful and per the minimum safety standards established for the crossing at a meeting that he was in attendance on September 14, 2010 (see Letter of Concurrence – **Exhibit #16**);   PSNH understood Kalika's in February of 2011 that Kalika was had made it known to everyone that the crossing had had not been

built to minimum safety standards and that he had issues with the construction of the crossing; that after the PSNH received non-exclusive crossing rights to the crossing PSNH and B&M locked the crossing; he neglects to state that PSNH did not own the crossing and that the crossing was Kalika's private crossing and that PSNH and B&M in placing their locks on the  crossing were locking Kalika (and CMI) form the crossing (see Snow Deposition **Exhibit #36**– pgs.  66-67); at the time of the alteration of the gates, posts, chains, and fencing at the crossing, the items were the property of B&M and/or PSNH, yet the crossing was "Kalika's private crossing, and the gates , gate posts, and all that Kalika altered were on the property of CMI and the Town of Merrimack, (**Exhibit #28** and **Exhibit #37** – which had been pled in the case when snow gave his affidavit); During the period that the crossing was closed PSNH was prevented from accessing the property it purchased from Kalika and inconvenienced in accessing the property from preliminary site preparation work, yet Snow in his deposition states that Kalika had provided him a key to the altered crossing and that B&M closed the crossing only after consulting with PSNH when PSNH told B&M that the closing would not delay their project. (Snow Deposition **Exhibit #36** – pgs.64-65).  Hannah K. Irving,( Real Estate Paralegal in Cairns' office, gave an affidavit that falsely stated the Kalika gave an affidavit, that falsely stated between the December 15, 2010 conveyance to Public Service Company of New Hampshire and the acquisition of real estate from CMI Leasing Corp. on October 21,2011, Kalika, LLC had no recorded ownership or easement interest in any land on the easterly side of the Northern Main Line, yet she reviewed Kalika's deed to PSNH (**Exhibit #22**) which stated "except that the Grantor, its successors and assigns shall be permitted to pave the Easement Area. Notwithstanding anything to the contrary, all installation of utilities shall be made so as to reasonably minimize the impact to the Grantor's and CMI Leasing Corp.' s use of the Easement Area and be subject to the Grantor's and CMI Leasing Corp.'s prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed." Cairns gave an affidavit which purposefully mislead the Court in stating that the following were true and actual copies of:  Kalika, LLC v. Boston & Maine Railroad, Hillsborough County

Superior Court No. 04-E-0059 Stipulation of Dismissal ● Kalika, LLC v. Boston & Main Railroad, NH Supreme Court No. 2009-0629 Stipulation of Dismissal ● In Re Kalika LLC -Request for Crossing in Merrimack, New Hampshire, NH, Department of Transportation No. 2009-04 Stipulation of Dismissal ● In Re Kalika LLC –Request for Crossing "near" or "south" of Star Drive in Merrimack, New Hampshire, New Hampshire Department of Transportation No. 2010-07 Stipulation of Dismissal ● General Release; yet Cairns knew that B&M had not met the conditions of the Conditional Settlement Agreement and that under the terms of the Conditional Settlement Agreement all those documents meant nothing and were documents that he was to has destroyed and did not.

90.     Furthermore, in late summer early fall of 2013, PSNH replaced the gates on both sides of the crossing with sliding gates and increased the width to 24'. The crossing was now in compliance with NHDOT's 2009 crossing order as to the width of the crossing being a 24' travel width, and is as it remains today. (Photo's - **Exhibit # 38; Exhibit #36** – pg. 78)

91.     Still not having access to its property, Kalika, owning Lot 4-1 (the 3.5 acre portion of land across from Star Drive and locked by the Railroad) (**Exhibit #8**), on April 12, 2012 petitioned NHDOT Commissioner, Christopher Clement, Sr., pursuant to NH RSA 365:1, to perform his duty under NH RSA 374:4, NH RSA 373:1 and NH RSA 373:10 and enforce B&M's compliance with its obligations of law under the Railroad Charter by which it acquired its property (and Kalika's predecessors in-title acquired their crossing rights). Without those rights being honored, Kalika is landlocked and needs a crossing for all its legitimate uses of it property, and hence by the State of New Hampshire is being deprived of its property rights guaranteed by both the Constitution of the State and Federal Governments.

92.     The NHDOT arbitrarily and capriciously refused to enforce its own orders and the relevant statutes. Specifically, on May 17, 2012 NHDOT Hearings Officer Kathleen Mulcahey-Hampson, Esq. ruled that that NHDOT had no authority to enforce the NHDOT-issued crossing order of October 7, 2010; and further refused to hear Kalika's request to expand Kalika's use of the crossing

(expand from zero; as matters stand now, Kalika has no use). The NHDOT took the position that it would consider a Kalika request for a specific defined use, but that Kalika was not entitled to a hearing on general use access to its property. (**Exhibit #39**)

93.     Kalika appealed the matter to New Hampshire Railroad Appeals Board on the issues of access to his property, and NHDOT enforcing it crossing order, noting that NH RSA 373:5 - states that when a railroad fails to comply with a NHDOT Crossing Order, it shall be guilty of a felony.  The Appeals Board refused to consider the RSA 373.5 issue, and relying on general case law ruled that the unrestricted crossing rights enshrined in the relevant deeds notwithstanding, the Board would only entertain specific use requests. See B & M Corp. v. Sprague Energy Corp., 151 NH 513 (2004): "A landowner whose land is cut off from a highway by a railroad has the right to a suitable crossing where a reasonable necessity therefor is demonstrated. Further, "a suitable crossing is one reasonably safe and convenient for the purpose at a location to be determined according to the use made of the land, its physical characteristics ..." Id at 516; see also Patterson v. B & M RR, 102 NH 387 (1960); RSA 373:1. Neither of these cases had claims related to either deeded rights or rights based on railroad Charter obligations.

94.     Kalika petitioned the New Hampshire Supreme Court for Mandamus, but the Court declined to hear the matter.

95.     Kalika still locked from its land by the Railroad, and without any of the three at grade crossing that the Railroad is obligated to provide, on January 16, 2015 again petitioned the NHDOT Commissioner to enforce the laws of the State of New Hampshire in having B&M comply with its obligations to provide Kalika an at-grade crossing and proper fencing installed at the eastern terminus of Star Drive, Merrimack New Hampshire under the obligations of the railroad as per NH RSA 373:1, NH RSA 373:30 and the Special Laws of the State of New Hampshire require. Kalika provided its Deed (**Exhibit #8**). The petition was ripe for hearing, even according to the Board's earlier position, in that Kalika petitioned cited specific needs for the land: to allow items to be stored on his land,

which requires the use of heavy machinery to access the property; to allow Kalika's friends and family to river access and recreational use of Kalika's property; to be able to market and sell a portion of the property for its highest value; and, Kalika has legal obligations to provide CMI access to their property.

96.    At the hearing officer's request, Kalika provided a letter from Precision Granite to NHDOT stating its uses of the property as Kalika had disclosed: that it would rent a portion of the property to store heavy equipment.  [The Precision Granite officer was unable to attend the hearing personally.] The NHDOT Hearing Officer, Kathleen Mulcahey-Hampson, Esq., recommended and NHDOT Commissioner, Victoria Sheehan, on December 21, 2015 ruled (**Exhibit #40**) that in-person testimony of the third party witness (from Precision Granite business) was necessary to describe the specifics of the proposed use regarding storage of granite blocks, including the number of crossings per day, the manner of crossing, the equipment/vehicles used to cross. The ruling allowed Kalika access for personal and family use, but only if Richard Kalika himself were present.  This restriction comprised a taking of Kalika's land even for the specific purpose supposedly permitted.[13]

97.    Kalika appealed to the Railroad Appeals Board; that appeal is currently pending.

98.    NHDOT has abdicated its duty and responsibility to enforce the Railroad's compliance with their Charter obligations, and has granted B&M rights that as the servient easement holder they do not have. It also has deemed that it has the power to take the real property right of a landowner to protect the Railroad, a private corporation, which the New Hampshire Constitution prohibits.

99.    The attempt by the NHDOT to tie the crossing's use to specific proposed land uses is in essence an appeal to "reasonableness," but the State is required to enforce compliance with specific charter terms, even if it later wishes to limit them based on post-facto demands or even reasonableness judgments.  See STATE V. WILTON R. CO., 89 N.H. 59 (1937):

---

[13] Moreover, no mention was made of witness Eric Stevenson from CMI that testified as to CMI wishes to use the crossing to which they have real property rights to use.

"The defendants would have the Wilton charter construed as not requiring any service unless there is a reasonable demand for it. They say that legislation should be construed sensibly and not to produce unreasonable results. But this principle is applied only to language whose meaning is doubtful. The requirement of a daily train each way is clear and explicit. Service to meet the public demand was to be provided, and the charter prescribes a minimum test of the demand….

"The Legislature has ordained that reasonable accommodation for travel shall be furnished by railroads. In respect to the Wilton road, [the Charter] has set a limit of least permissible accommodation. The Public Service Commission's function is to enforce these duties. But it has no power to change them…. [T]he commission therefore has no power to repeal the charter provision, assuming it to be a regulation which delegated authority might be empowered to repeal."

## COUNT 1 - VIOLATION OF U.S. CONSTITUTION - ARTICLE 1 SECTION 10

100.    Plaintiffs incorporate each of the above paragraphs as if fully set forth herein.

101.    The State of New Hampshire, through NHDOT, has impaired the obligation of B&M to comply with the contractual requirements of the Lund and Crooker deeds, and has specifically interfered with Kalika's exercise of his contractual rights under said deeds.

102.    Kalika seeks an injunction or other order of Court enjoining the State of New Hampshire, and all of its agencies and officers, from taking any action inconsistent with the Charter obligations of the Railroad, and to enforce its rights thereunder.

## COUNT 2 - VIOLATION OF U.S. CONSTITUTION- 5th & 14th AMENDMENTS

103.    Plaintiffs incorporate each of the above paragraphs as if fully set forth herein.

104.    The Defendants, B&M, PSNH, PAR, PSNH, Burns, Cairns, Bergeron, Irving, Snow, and Does 1-10 (Count 2 Defendants) have  intentionally conspired to deny Kalika and Richard Kalika their rights under the 5th and 14th Amendments to due process of law, and deny them the privileges and immunities of citizens of the United States as guaranteed by the same Amendments.

105.    Plaintiffs have been injured by said deprivation of its rights.

106.    Plaintiffs Kalika and Rick Kalika seek an injunction or other order vindicating their civil rights and due process rights that have been purposefully violated by the defendants; and that the Court grants such other relief it deems appropriate.

## COUNT 3 - VIOLATION OF U.S. 18 U.S.C. § 241

107.    Plaintiffs incorporate each of the above paragraphs as if fully set forth herein.

108.    The Count 3 Defendants, B&M, PSNH, PAR, Cairns, and Does 1-10 (Count 4 Defendants) have intentionally conspired to injure, oppress, threaten and intimidate Plaintiffs Kalika, and Richard Kalika, committing acts stated above, including obstruction of justice, obstructed/influence criminal investigations, obstructed Local and/or State law enforcement, tampered with evidence, and/ or extorted in an effort to taken from Kalika its civil rights to enjoy its real property while  taking Kalika real property rights for the enjoyment of the enterprise. And  their own gain

109.    Plaintiffs Kalika and Rick Kalika have been harmed by the Count 4 Defendants' unlawful actions, and seek damages for same in an amount deemed appropriate by this Court, and that the Court grants such other relief it deems appropriate.

## COUNT 4 - VIOLATION OF 18 U.S.C. § 1341

110.    Plaintiffs incorporate each of the above paragraphs as if fully set forth herein.

111.    The Count 4 Defendants, B&M, Cairns, and Does 1-10 (Count 4 Defendants) have intentionally conspired to purposefully commit Mail Fraud upon Kalika and Rick Kalika, sending them a letters by U.S. Mail with purposely false and misleading statements to extort and induce them to sign documents that they would other devised or intending to devise a scheme or artifice to defraud, property by means of false and fraudulent pretenses, representations, and  promises, for the purpose of executing such scheme or artifice and attempting so to do, placed such in a post office for mail matter, letters to delivered by the Postal Service, knowingly causing it to be delivered by mail

letters that were meant to make false representations, intimidate and/or extort from Kalika signed documents that Kalika had otherwise been unwilling to provide.

112.    The Plaintiffs have been damaged by these unlawful actions and racketeering activities of the Court 4 Defendants

113.    The Plaintiffs ask the Court to grant damages as outlined in ¶29 - 39 above for the damages purposeful cause by the causes by the Count 4 Defendants.

## **COUNT 5 - VIOLATION OF 18 U.S.C. § 1512**

114.    Plaintiffs incorporate each of the above paragraphs as if fully set forth herein.

115.    The Defendants PSNH, B&M, Burns and Cairns made arrangements for Bergeron, Irving and Snow (Count 5 Defendants) have purposefully engaged and conspired to provide testimony and/or affidavits that they knew or should have known to be false, and encouraged such action, to deliberately deceive the Court and obstruct Kalika from the justice and due process it had long sought, and to harm Kalika.

116.    The Count 5 Defendants also used physical force and threats of physical force in an attempt to stop Kalika and Rick Kalika from testifying in an official proceeding, they also used physical force to conceal the location of their reconstruction of the crossing with the intent to impair the availability of the crossing from a Court proceeding.

117.    The Plaintiffs have been damaged by these unlawful actions of the Court 6 Defendants.

118.    The Plaintiffs ask the Court to grant damages as outlined in ¶29 - 39 above for the damages purposeful cause by the causes by the Count 5 Defendants.

## **COUNT 6 VIOLATION OF 18 U.S.C. § 1962(a)**

119.    Plaintiffs incorporate every state each of the above paragraphs if fully set forth herein.

120.    This Count 6 in against Defendants B&M, PSNH, PAR, PSNH, Burns, Cairns, Bergeron, Irving and Snow, John Does 1-25, Jane Does, 1-25, and Does 1-10 (Count 6 Defendants).

121.    B&M is an enterprise engaged in and whose activities affect interstate commerce. The Count 11 Defendants are employed or associated with the enterprise.

122.    The Count 6 Defendant(s) agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. These activities are outlined in the each and every paragraph above.

123.    Pursuant to and in furtherance of their fraudulent scheme, Defendant(s) committed multiple related acts of the multiple racketeering acts (including relating to: Mail Fraud; tampering with a witness, victim, or an informant; retaliating against a witness, victim, or an informant; interference with commerce, robbery, or extortion; relating to engaging in monetary transactions in property derived from specified unlawful activity) ;

124.    The acts Mail Fraud; tampering with a witness, victim, or an informant; retaliating against a witness, victim, or an informant; interference with commerce, robbery, or extortion; relating to engaging in monetary transactions in property derived from specified unlawful activity set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

125.    The Count 6 Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

126.    As a direct and proximate result of the Count 6 Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in as they have been unable  injured through the taking of its real property, and through the related racketeering activities as stated above.

127.    WHEREFORE, Plaintiff prays that this Court enter judgment against the Count 6 Defendant(s) as stated in paragraphs 39-50 as well as treble damages and attorney fees and costs related those racketeer activities.

## COUNT 7 -  VIOLATION OF 18 U.S.C. § 1962(b)

128.    The Allegations of Paragraphs 31 through 168 Paragraphs are incorporated herein by

reference.

129.    This Count is against Defendant(s) B&M, PSNH, PAR, PSNH, Burns, Cairns, Bergeron,

Irving and Snow, John Does 1-25, Jane Does, 1-25, and Does 1-10 (the "Count 7 Defendants").

130.    B&M is an enterprise engaged inn and whose activities affect interstate commerce.

131.    The Count 7 Defendants used and invested income that was derived from a pattern of

racketeering activity in an enterprise.

132.    This Count is against Defendants (Plaintiffs incorporate every state each of the above

paragraphs if fully set forth herein. As an example the moneys the gained from Anheuser –Busch

because of the racketeering activity has enabled them to further the racketeering activities and well

and the legitimate activates.

133.    The acts Mail Fraud; tampering with a witness, victim, or an informant; retaliating against a

witness, victim, or an informant; interference with commerce, robbery, or extortion; relating to

engaging in monetary transactions in property derived from specified unlawful activity set forth above

constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

134.    As a direct and proximate result of the Count 7 Defendant(s)' racketeering activities and

violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property in that

they have been unable to derive  an income form their real property through the it use as a Sport

Complex and zoned and legitimate use of the land. The Plaintiffs have been unable to derive Income

form the use of their property through the use of it as a Sport Complex and over business ventures,

while the Defendants have used the income to produce income through their legal endeavors as well a

fund further fund their continuing racketeering activities. See Part VI, Section 1962(a): Investment of

Racketeering income As a direct and proximate result of the Count 7 Defendant(s)' racketeering

activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and

property in that they have been unable to use their real property for business purposes. And have had the expense of protecting its rights from these racketeering activities.

135.    WHEREFORE, Plaintiff prays that this Court enter judgment against the Count 7 Defendant(s) as stated in paragraphs 39-50 as well as treble damages and attorney fees and costs related those racketeer activities.

## COUNT 8 - VIOLATION OF 18 U.S.C. § 1962(c)

136.    Plaintiffs incorporate each of the above paragraphs as if fully set forth herein.

137.    This Count is against Defendant(s) B&M, PSNH, PAR, PSNH, Burns, Cairns, Bergeron, Irving and Snow, John Does 1-25, Jane Does, 1-25, and Does 1-10 (the "Count 8 Defendants").

138.    B&M is an enterprise engaged in and whose activities affect interstate commerce.

139.    The Count 8 Defendants acquired and maintained interest in and control of the enterprise through a pattern of racketeering activity. By taking the land of landowners that the railroad was obligated to provide dominant crossing rights to landowners. It has been able to avoid costly expenses that it would have otherwise had to take as the predecessors did in insuring the rights of the landowners to which they were obligated, which drove their predecessor into bankruptcy. They have further been able to conduct business that they otherwise would not have been able to conduct had they conducted that business without their racketeering activity.

140.    The Count 8 Defendants racketeering acts  of  Mail Fraud; tampering with a witness, victim, or an informant; retaliating against a witness, victim, or an informant; interference with commerce, robbery, or extortion; relating to engaging in monetary transactions in property derived from specified unlawful activity set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

141.    The Count 8 Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

142.   As a direct and proximate result of the Count 8 Defendants racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property in that: Plaintiffs have been injured in their business and property in that they have been unable to derive an income form their real property through the it use as a Sport Complex and zoned and legitimate use of the land. The Plaintiffs have been unable to derive Income form the use of their property through the use of it as a Sport Complex and over business ventures, while the Defendants have used the income to produce income through their legal endeavors as well a fund further fund their continuing racketeering activities. See Part VI, Section 1962(a): Investment of Racketeering income As a direct and proximate result of the Count 12 Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property in that they have been unable to use their real property for business purposes. And have had the expense of protecting its rights from these racketeering activities.

143.   WHEREFORE, Plaintiff prays that this Court enter judgment against the Count 8 Defendant(s) as stated in paragraphs 39-50 as well as treble damages and attorney fees and costs related those racketeer activities.

## COUNT 9 - VIOLATION OF 18 U.S.C. § 1962(d)

144.   Plaintiffs incorporate each of the above paragraphs as if fully set forth herein.

145.   This Count is against Defendant(s) B&M, PSNH, PAR, PSNH, Burns, Cairns, Bergeron, Irving and Snow, John Does 1-25, Jane Does, 1-25, and Does 1-10 (the "Count 9 Defendants").

146.   As set forth above, the Count 9 Defendants agreed and conspired to violate 18 U.S.C. §§ 1962(a) (b) and (c). As a direct and proximate result of the Count 1 Defendants racketeering activities and violations of 18 U.S.C. § 1962(b), the racketeering acts Mail Fraud; tampering with a witness, victim, or an informant; retaliating against a witness, victim, or an informant; interference with commerce, robbery, or extortion; relating to engaging in monetary transactions in property derived from specified unlawful activity set forth above constitute a pattern of racketeering activity pursuant

to 18 U.S.C. § 1961(5). Allowing  the Defendants to use the incomes hey have derived from their racketeering activities, like their income from Anheuser –Busch due to their racketeering activity which has enabled them to further the racketeering activities as well and the fund their legitimate activates,, something that the bankrupt predecessor was unable to so as they did not conduct such racketeering activities.

147.    The Count 9 Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Count 14 Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

148.    As a direct and proximate result of the Count 9 Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that: in that they have been unable to derive an income form their real property through the it use as a Sport Complex and zoned and legitimate use of the land. The Plaintiffs have been unable to derive Income form the use of their property through the use of it as a Sport Complex and over business ventures, while the Defendants have used the income to produce income through their legal endeavors as well a fund further fund their continuing racketeering activities. See Part VI, Section 1962(a): Investment of Racketeering income As a direct and proximate result of the Count 9 Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property in that they have been unable to use their real property for business purposes. And have had the expense of protecting its rights from these racketeering activities.

## **COUNT 10 - VIOLATION OF 42 U.S.C. § 1983**

149.    Plaintiffs incorporate each of the above paragraphs as if fully set forth herein.

150.     This Count is against Defendant(s), B&M, Cairns, John Does 1-10, Jane Does and Does 1-10 (the "Count 6 Defendants").

151.    The Count 6 Defendants and under the color of law, regulation, custom, and/or usage of the State of New Hampshire have and/or continue to subject Kalika and Rick Kalika within their jurisdiction and acted and/or conspired to act to act to deprive Kalika and Rick Kalika of the rights, privileges, and immunities of the Constitutions and laws of the United States of America.

152.    Under 42U.S.C. § 1983 they are liable for such actions. As in all cases such actions have been taken which violate the duties and powers entrusted to them and they are sworn to uphold.

153.    Kalika and Rick Kalika have been damaged by the actions the Count 6 Defendants action to take its real property rights guaranteed by the U.S. Constitution, under color of law of the State of New Hampshire, s the all knowingly acted outside their duties and responsibilities.

154.    As a direct and proximate result of the Count 6 Defendant(s)' unlawful activities and violations of 42 U.S.C. § 1983, Plaintiffs have been injured in their business and property in that they have been unable to derive  an income form their real property

155.    The Plaintiffs ask the Court to grant damages as outlined in ¶39 - 50 above for the damages purposeful cause by the causes by the Count 10 Defendants.

*[remainder of page left intentionally blank]*

Respectfully Submitted,

KALIKA, LLC,
By its attorney

/s/ Martin H. Karo
Martin H. Karo
205 Garber Drive
Yardley, PA 19067-7342
(Tel) (215) 428-2502
Email: martin.karo@verizon.net

Pending *Pro hac vice* admission

and

RICHARD L. KALIKA,
Pro se,

/s/ Richard L. Kalika
Richard L. Kalika (*Pro Se*)
1 Hansom Drive
Merrimack, New Hampshire 03054
(Tel)  (603) 440-8308
Email:  rick-kalika@msn.com

Friday, May 13, 2016